May it please the Court, Rich Buzzi for Ms. Ranza. If you're a shoe company, what's the first thing you need? Stuff to make shoes, someone to make them for you, a place to make them, and a way to get them to market. And those are all things that Neon appointed Nike to do as its agent right here in Oregon. And those imputed contacts alone are sufficient to confer jurisdiction over Neon here. Did Chrysler disapprove our agency theory? The Supreme Court said this agency theory can't be affirmed in any way. Our reasoning is just... I don't believe so. Bauman did not say... All Bauman said is that it's insufficient to prove continuous and systematic contacts. They have to be such that the party is at home here. And because these are contacts that are so fundamental to a shoe company making shoes and getting them to market, that if it weren't for Nike's conduct here as its agent on its behalf, Neon simply wouldn't have any shoes to sell. So they would qualify as sufficiently important, continuous, and substantial contacts here in the state of Oregon. Well certainly the agency theory that we invoked in Daimler Chrysler, the Supreme Court said could not be... Let's see. Could not be sustained. In no event could our analysis be sustained. And then they sort of gave the back of the hand to our alter ego theory, but not quite as ferociously. So how could we, given the test set forth in Daimler Chrysler for being at home, how Well I believe... It doesn't matter what you call it. Because they would need to be imputed contacts, otherwise the world's criminals would be able to act with impunity because they could just use a shield in the form of an agent. So... How is Neon at home? I mean, in other words, are you just saying this is another version of your alter ego theory? Or otherwise, how is Neon at home in Oregon? It's at home because those are imputed contacts. Because it's the same company as Nike, it's at home? Is that what you're saying? No, I believe that this is different from the alter ego test. It would be counted towards the minimum contact test. Whether you're acting individually, directly, or whether you're acting through an agent. All of that would go to minimum contacts, whether you couch it in terms of agency or whether you talk about it in terms of minimum contacts. That would be all part of the mix. In this case, that case is aided by Neon's own contacts here, 47 trips a month to train, strategize, beg for resources, market to affiliates. It sounds... You know, I have a little trouble on this analysis in that it seems you're saying Neon appointed Nike its home away from home. Yes. It's kind of like the tail wagging the dog, isn't it? Nike's the parent corporation and Neon is the sub, isn't it? Well yes, but other cases have recognized that the geographic placement of the parent and sub for alter ego purposes is immaterial. The Boato case, we cite those at our reply brief, page 25. Also with regard to the agency, the parent acting as an agent at page 25 of our reply brief, that's neither unprecedented nor legally impossible. Now you're talking about an alter ego theory? Pardon your honor? Now you're talking about an alter ego theory? Are you talking about agency? We have cases that indicate where... Go ahead. Yes. Agents for both. Agents, the parent can act as the agent for the subsidiary and we cite those cases at page 25. And also in terms of the alter ego analysis, it really doesn't matter whether the subsidiary is in the forum state or whether the parent is, the geographic placement is immaterial on that count. In addition to the employees being here... It's still relevant to the analysis as to which is the sub, which is the parent, because are you trying to say Neon controls Nike or are you saying Nike controls Neon? Well, if the walls come down, it really doesn't matter, does it? Because... So that's the alter ego issue. That's the alter ego. They're essentially the same company. Yes. So is that your main argument? No. No. No. The agency theory is our first position because of the agency contracts, ER 360, 370, appointing Nike to perform those essential functions. The minimum contacts, including those with the 47 trips a month for those basic functions that any marketing conduit is going to need to perform. And then, of course, the court was correct in applying the alter ego test in saying that because of the extraordinary control that Nike exerted over Neon, that the alter ego test applied down to the way its store displays were to look, whether or not it could hire individuals at any particular time, having imposed restrictions, caps, and freezes over the years, or if the articles had been allowed in, hiring people over a certain salary. So the issue of jurisdiction was correctly decided under the alter ego test by the magistrate judge. The question then becomes, was the court correct, and did defendants meet its burden of proof by compelling evidence that the exercise of jurisdiction would be unreasonable? I'm not going to repeat what I said in the brief, but just focusing on two points. The defendant was unable to carry that burden that is so gravely prejudiced by defending here, and the reason for that is this, that the Nike firing managers came here, Soto and Rogers. Mullen, a former manager, came here. Other Neon managers have migrated here. I thought there was only one manager who actually had management roles in both companies, in both Nike and Neon, at the same time, and otherwise they were seconded to, so Neon managers were seconded to Nike or vice versa. Is that incorrect? We have Newton McLaughlin, who was... That was the one manager who actually had a role in both companies, a management role. Is that the only one, or were there others? There was Dede Wilson, and I'm sorry, but I don't have the exact role that she played, but she played roles in both companies simultaneously. In terms of the four-factor test on whether or not the parent exercised parental control under the four-factor test under the statute, and you're looking at the second factor, which has to do with common management, not only do you look at whether or not there are key managers in common, which would, in this case, be McLaughlin and Wilson, but also, Watson discussed management swapping, and these companies swapped managers all the time. As far as the control test under the statute, that's a question of substance, not jurisdiction, so that if there's any question of fact on that, then the motion should be dismissed and it should be decided by a jury. And here there was, if you go through those four factors, first having to do with interrelationship of operations, in addition to pointing Nike as its agent to source and manufacture products, Nike provided IT and transport services, marketing, supply chain, and finance tracking services. Nike established global product categories, brand consistency. It determined which sub would get the inventory in the event of a shortage. Now you're talking about Title VII employer control, right? Is that what you're talking about now? Yes, Your Honor. This is under the, having established jurisdiction. Over Neon. Now you're switching over. Well, Nike's a defendant here and jurisdiction does exist over Nike, correct? Of course. Right. Now you're focusing on the Title VII. That's correct, Your Honor. There was a new, there was a, we asked for supplemental briefing on a, I think on an issue that might, you might want to look at before we get to the Title VII inquiry. Comedy. Comedy. I would be happy to discuss that. Defendants say that we should decline, the Court should decline jurisdiction on the doctrine of comedy, but plaintiff's claims were not adjudicated in either proceeding. Not in the court of Hilversum, where the court expressly declined to hear Ms. Ronza's discrimination claims. Its ambit was only to decide whether or not her. What about ETC? Okay. The ETC, that was a proceeding before an investigative body in the Netherlands. There was no cross-examination, no discovery, no sworn testimony. And what's important there is the ETC doesn't have the ability to grant relief. Well, they can issue a declaratory judgment. They could issue, they issue a judgment. It is not. Is that what they did here? They found that she was not subjected to discrimination? Yes. They, they decided that, applying different standards than we would apply under Title VII. But they, their judgment is not legally enforceable under their own rules. And. So if they had found that there had been sex discrimination. Couldn't enforce it. She couldn't enforce it? Correct. Could they go, could the ETC go to court on its own? There is evidence in the record in Ms. Westerbeek's declaration that the ETC does have the power to do that, but whether or not, whether or not it, but that's theoretical. They ruled against her in this particular case under different standards than apply. Without the procedural safeguards of. In the courts of Netherlands, could she, having, even though she lost in front of the commission, could she still have gone into court in the Netherlands and raised her claims? According to their expert, she could have. Our expert says to do so would be unprecedented. Is that because she lost or just because one does not go into court after the commission has ruled? There isn't any connection between the ETC and court. You know, as a matter of fact, the when the court of Hilversum declined to hear her discrimination claims and suggested the options that she had available, it suggested the ETC and or coming to the United States. It didn't suggest an option of going into the Netherlands courts. Why would she have gone to the ETC? What was the reason? Is that in the record? Pardon me? The purpose of going to the ETC. So if getting a ruling that she had been discriminated against would have no effect, why would anyone do that? Well, it's it's it's what their culture provides. It's it's an administrative mechanism. It's not a court. It doesn't have, as I say, sworn testimony or discovery. But that's that's something that is available. So is that why she went? I wasn't representing her at that time. She was represented by a lawyer in the Netherlands. And so as far as the motivations or what were discussed, I it's beyond my ability to comment. So to decline jurisdiction on the basis of the ETC proceeding would be the same as declining jurisdiction in this country where the EEOC had looked into and ruled on something and it just is not something that that is a proceeding that that since you had no remedy and in the Netherlands. Well, like I say, their expert said that there was a the capacity to bring a direct tort action in the Netherlands. And according to our expert, that is unprecedented and it's not done there. Their expert didn't say that she'd ever done it in her seven and a half years of practice, seen anybody else who'd done it and cited no authority for that proposition. So that's our position is that a U.S. citizen is entitled to the selection of a forum that offers more than a theoretical chance at relief. In terms of comedy, Mujica is distinguishable. There you were dealing with a a state remedy and not a federal remedy where the plaintiffs had already sought and obtained substantial relief in the Colombian courts where none of the plaintiffs were U.S. citizens of the U.S. State Department and issued at a statement of interest saying it would be policy foreign policy interests of the United States to proceed. The Colombian government had also objected and offered its courts for the relevant litigation and that contrasts here where the court of Hilverson suggested as one option to pursue litigation in the U.S. courts. So it looks like my time is up. I'd like a minute, well you're over your time, but I'll give you a minute for rebuttal. Thank you, Your Honor. Good morning. May it please the Court. I'm Amy Joseph Peterson from the Stoll-Reeves Law Firm. I'd like to begin with the comedy issue. The district court properly dismissed Ms. Ronza's claims. She attempts to bring in a U.S. court a matter that has been finally and fully resolved by two courts in the Netherlands. In fact, she got more process in the Netherlands than she could have received in the United States. She had a hearing where she was represented by counsel before the city court of Hilverson in which it was decided whether or not Neon had adequate grounds to terminate her employment relationship. But they expressly disavowed and declined to address the discrimination issues. They expressly declined to address it, Your Honor, but they only applied a neutral factor to her termination and because they only applied a neutral factor, they awarded her $200,000 in separation pay from Neon.  And they only applied a neutral factor for the employer's conduct and raised that separation pay. My only point in bringing up the court of Hilverson proceeding is to demonstrate that in fact the Netherlands adheres to a for-cause or just-cause standard that this country does not abide by. It may be, but they didn't reach the discrimination issue, and so you're saying they could have given her more than $200,000? Correct. It was an opportunity for her to address that issue. But she didn't get to put in any evidence of discrimination, is that right? She did put in evidence of discrimination. The court of Hilverson declined to address it in its ruling. We don't know what they concluded on that. You're correct, but we know that she had an opportunity to present that evidence. She then took the matter before the Dutch Equal Treatment Commission, which is the body in the Dutch legal proceeding that is purposefully designed with the chore of ferreting out discrimination in the workplace. They held a full and complete hearing. Witnesses gave oral testimony. The court engaged a neutral, third-party expert witness to testify. The court issued a 14-page single-space judgment, which is in the record, finding that she had not been subjected to discrimination. It is true, as Mr. Busse said, that the exact same procedures are not used in the Dutch courts as they are here. You heard Mr. Busse say that there was no ---- I'm sorry. So that was before an administrative agency commission, right? Correct. Correct. Your comment about the procedures are not the same in court? No. Then she ---- so the procedures before the administrative body are not the same procedures as we have, for example, before the Oregon Bureau of Labor and Industries. But this Court has said, it said it in Mujica and it said it in other cases, that the exact provision of the exact same procedures is not relevant. So could you address whether the ETC would meet the requirement of being an adequate forum when it couldn't provide RONSA with equitable or monetary relief? Yes. First of all, here, the ETC found no discrimination. It is clearly charged with assessing and determining whether or not someone has been subjected to workplace discrimination. That is the purpose of its existence and it found that she had not. That resolves the issue of whether or not she had a full and fair hearing. On top of that, she did have the opportunity to go to court. I take ---- I believe that Mr. Busse misspoke when he said that the expert testimony in the record is in conflict in this point. It's not. Ms. Westerbeek testified that the remedy in Dutch court is available. She didn't pursue it. That's the remedy. How does it work? Is there a statute? The Dutch Constitution prohibits discrimination against women and she could have pursued a claim there. Her own expert, Ms. Peijemans, I'm not sure how to pronounce it, said that there were cases of sex discrimination in the Dutch courts. That is in the Peijemans declaration. What she goes on to say is that no one has pursued such a claim in Ms. Renza's circumstances. Well, of course, she lost before the ETC. There was a finding, a complete finding, that she had not been subjected to discrimination in the Netherlands. That appears to be the reason why she came to the United States to seek relief here. And by the way, she initially came to Michigan, not Oregon. She did not associate her claim with Oregon. She filed with the EEOC in Michigan. The Michigan EEOC transferred it to Seattle and Seattle dismissed because of comedy. So the issue, Mujica resolved the question about whether or not a direct conflict, a true conflict in the law had to exist before the doctrine of comedy could apply. And once that, once this Court issued that opinion last year, it became clear here there was no conflict in the law. The Netherlands prohibits discrimination against women in the workplace the same as United States law did. And once it became clear that no true conflict was required, it became evident to us that this Court should defer to the findings of the Dutch proceeding. So Judge Ikuda asked your opposition counsel over here, what's the advantage of going to the ETC? I assume, I'm not a Dutch lawyer and I don't know. It is a commonly used mechanism. The testimony in the record is that it has moral force and authority in Dutch culture to prohibit through the declaration of its findings violations of discrimination that are apparently taken quite seriously in Dutch culture. That is what the declaration of Ms. Westerbeek talks about. But your Honor, it doesn't, it really is not relevant that the ETC could not issue, could not provide her with damages. For example, the foundation agreement case involving the Nazi reparations court, plaintiff made the same argument there to this court, that it was an insufficient remedy because the foundation agreement established between the United States and the German government didn't provide for adequate damages. And this Court says that's not material. What's material is whether or not there is a forum available that addresses the exact same legal issue. And here the Dutch court, or the Dutch tribunal responsible for determining whether or not discrimination occurred in the workplace, heard this case and declared that it had not. If this court were to permit her to pursue this claim here in the United States, it would, one, encourage forum shopping, two, be disrespectful to a qualified court applying its laws, the laws that are the same as the United States in terms of prohibiting discrimination, and we urge the court not to do that. If there are any other questions on comity, I'd like to turn to the Court. Did you address Title VII claims against Nike? I'm sorry, say that again? Did you address Title VII claims and ADEA claims against Nike? Sure. That is the control issue. The control issue. Yes. Our position, as you're well aware from our briefing, is that Why aren't there tribal issues of fact with respect to the degree of control? Judge Acosta's opinion, as I'm sure you all are aware, is an incredibly detailed review of the evidence. It's 84 pages, single-spaced. It is clear from a review of that opinion that he did not weigh any of the evidence. He did assess the evidence, as this Court has instructed lower court judges to do, to determine whether or not there was any genuine issue of material fact, and he found that there was none.  There is no evidence in that opinion that he made any credibility assessments, that he weighed any evidence. He clearly did assess it, and we argued to the Court, for example, we provided in docket 109, I think it's a 50-page chart of misrepresentations of the record evidence that plaintiff made in this case, and I'm confident that he took that into account. You can see evidence that he took that into account in his opinion, but that doesn't mean that he weighed the evidence or assessed credibility. With respect to the control issue, the dialogue that the Court had with Mr. Busse, in my view, hit the nail on the head in terms of the assessment of who controls who here. On the one hand, plaintiff is arguing that Neon controls Nike for purposes of the agency and alter ego test for personal jurisdiction, but on the other hand, he claims that Nike controls Neon for purposes of application of the control test under Title VII and the ADEA. He frankly can't have it both ways. The evidence in the record is unrefuted, and I'm referring now to the declarations that are contained in the supplemental record of Graham, Miller, Conroy, and Rogers, unrefuted declarations that Nike does not interfere in the day-to-day operational control of Neon. Neon is a 530 million euro annual revenue company capitalized with, I forget what the number is, but it's some astronomical number, with over 1,500 employees and over 70 employees alone dedicated to human resources of Neon alone. There are no, Mr. Busse referred to the common swapping of executives, there is no evidence in the record of any swapping of executives. There is evidence, as Judge Okuda pointed out, of one executive who is under the common management element of the control test. Ewan McGoughlin is the president, chief executive officer of Neon. He is also a Nike vice president. It is certainly not unusual for a global corporation to have the very highest person at a main subsidiary also be an officer of the parent company, and that does not impact the common management prong of the control test. If we were to agree with you on the comedy issue, we wouldn't need to reach that control issue, right? Correct. If you rule in favor of Nike and Neon on the comedy issue Just Nike for a moment. Neon has jurisdictional issues. Correct. If you rule in favor of us on the comedy, that also dismisses the claims against Nike. You would be abstaining as to the claims against Nike as well. So turning for a moment to Neon. Yes. And the jurisdictional argument. The magistrate judge here focused on the alter ego approach. Yes. And found that through his analysis, and very detailed as you said, very, very, very detailed, the alter ego doctrine applied. Yes. But then said it would be unreasonable to assert jurisdiction. Correct. So what was wrong with his alter ego analysis? The truth is that I don't know how he got there. I don't know how you can say that Nike Inc. and Neon BV, based on this record, are one and the same company. Nike Inc. is a global empire, if you will. I don't think anyone would really dispute that. It has various subsidiaries around the world. Neon is one of them. Neon does not control Nike. Neon does not dictate Nike policy. And to say that Neon is Nike's alter ego I think is simply a mischaracterization of the evidence. Now we do not dispute, Your Honor, that Nike, I'm sorry, that Neon may be considered  And in that respect, I suppose it's possible to conclude that for purposes of Nike Inc. operations in Europe, its alter ego in Europe is Neon. But even that is a stretch of the facts. It's clear, for example, from the record that Neon has no authority. It is prohibited from its licensing agreement, from selling goods anywhere in the world other than in Europe and the Mideast and Africa. It can't sell goods in the United States. How can it be an alter ego of its parent entity when it doesn't even have the authority to conduct business the same way its parent organization does? I'm afraid that's Do you think after Bauman that the alter ego approach even continues to exist today? You know, Judge, excuse me, Justice Judge. No, no, no. I was referring to the author. No, I know. No, no, no, no. I was trying to remember who wrote, Sotomayor wrote the Ginsburg. Thank you. Justice Ginsburg did not address alter ego. I do not think it is clear whether or not the alter ego theory survives Bauman v. Daimler. I think it is clear that agency doesn't survive. And I think that's as far as I can take the Bauman decision. Okay. I see that my time is up. Thank you, Your Honor. Thank you. I'll give you a minute for rebuttal. Thank you, Your Honor. Thank you. Defendants doubt that the EEOC dismissed the administrative charge because it deferred to the ETC as if that were significant. The EEOC merely treated that proceeding no different from any other when it's dealing with a state deferral agency. The dismissal didn't mean it agreed with the decision. You'll note on SER 47, they didn't say it adopted the FTC, the ETC finding. That box wasn't checked. With regard to the 200,000, that was not damages. That was paid in the form of a severance, which is typically taking into account past service and the length of past service. It says nothing about the damages one would suffer who is unjustly terminated. With regard to the agency, you can't have it both ways. They would have you ignore the agency agreements that are not agents for all purposes, but they appoint Nike as NEON's agent for the limited purposes there in the agency agreements. Those should be given effect. As far as Peijmans and what she said or didn't say in her declaration, she said there are very few cases in the Netherlands concerning sex discrimination and the cases existing mostly discuss employment conditions of female employees who are pregnant or on maternity leave. As far as I know, there is no case law which is comparable to the situation of Ms. Ronza. She doesn't say that the incomparability has anything to do with the ETC proceeding. Thank you, counsel. I appreciate your arguments. The matter is submitted. Thank you, Your Honor.
judges: Fisher, Paez, Ikuta